ground that the objections failed to present any genuine or substantial issue of fact.

B.

[2] The February 17, 1984 FDA ruling not only disposes of the plaintiffs' request for a hearing but also deprives a district court of jurisdiction. Section 409(g)(1) of the Act, 21 U.S.C. § 348(g)(1), governs judicial review of FDA orders relating to food additives. The section provides that judicial review of any order ruling or objection to the grant or denial of a food additive petition may be had in the United States Court of Appeals within 60 days after the entry of such order.

The United States Court of Appeals for this circuit has repeatedly held when interpreting similarly crafted statutes that jurisdiction in the court of appeals is exclusive, and that jurisdiction does not lie in the district court. *E.g., Amusement & Music Operators Association v. Copyright Royalty Tribunal,* 636 F.2d 531 (D.C.Cir.1980) (appeal from the Copyright Royalty Tribunal under 17 U.S.C. § 810), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1352, 67 L.Ed.2d 336 (1981); *City of Rochester v. Bond,* 603 F.2d 927 (D.C.Cir.1979) (appeal from the Federal Communications Commission under 47 U.S.C. § 402(b)(6) and from the Federal Aviation Administration under 49 U.S.C. § 1486(a)). In *Bond,* the court stated "[i]f ... there exists a special statutory review procedure, it is ordinarily supposed that Congress intended that procedure to be the exclusive means of obtaining judicial review in those cases in which it applies." *Id.* at 931. Indeed our court of appeals has applied that principle even in a situation where the statute providing for review in the appeals court also contained language that such review "shall be in addition to and not in substitution for any other remedies provided by law." *Independent Cosmetics Manufacturers v. H.E.W.,* 574 F.2d 553 (D.C.Cir.) (quoting from section 701 of the FDC, 21 U.S.C. § 371), *cert. denied, Pineapple Growers Association v. Food and Drug Administration,* 673 F.2d 1083 (9th Cir.1982), nor grant the requested stay. *See, e.g., Allan v. Securities and Exchange Commission,* 577 F.2d 388 (7th Cir.1978).

439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978). Thus, in *Independent Cosmetics Manufacturers,* despite the savings clause, the court of appeals affirmed the district court's dismissal for lack of subject matter jurisdiction.

In short, because the FDA has issued final orders with respect to all of its requests, jurisdiction over any objections plaintiffs may have to those orders relating to aspartame lies in the court of appeals.

Lastly, the plaintiffs claim that at least with respect to the FDA order of July 24, 1981, approving the dry uses of aspartame—where more than 60 days have elapsed since the FDA issued that order and consequently there no longer is jurisdiction in the court of appeals—that they should be permitted to press their claims here. However, even with respect to those claims the plaintiffs may obtain review in the court of appeals, if appropriate. Under section 409(h) of the FDC Act, if plaintiffs have new evidence, unavailable to the FDA when it promulgated the dry use regulations, the plaintiffs may petition for reconsideration. 21 C.F.R. § 10.33 provides for reconsideration "on the Commissioner's own initiative or on the petition of an interested party." Section 409(g)(1) of the FDC Act explicitly extends to review of "any order ... with respect to repeal of a [food additive] regulation." 21 U.S.C. § 348(g)(1). Thus if the FDA would deny a petition for reconsideration, plaintiffs may be able to seek review in the court of appeals at that time.

Based on the foregoing, it is this 22nd day of March, 1984,

ORDERED

That plaintiffs' second motion for temporary restraining order is denied.

That defendant's motion to dismiss is granted.

That plaintiffs' complaint is dismissed pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction.



**William PETRARCA**

**v.**

**STATE OF RHODE ISLAND, et al.**

**Civ. A. No. 83-0043 P.**

United States District Court,
D. Rhode Island.

March 23, 1984.

Prisoner brought section 1983 action alleging various due process violations in Parole Board's consideration of his parole petitions. On review of magistrate's recommendation that case be dismissed, the District Court, Pettine, Senior District Judge, held that although new statute creates a liberty interest in parole release, none of the due process violations which prisoner alleged occurred after effective date of that statute, and thus he could not maintain section 1983 action.

Case dismissed.

**1. Constitutional Law ⚷272.5**

Prisoner has cognizable liberty interest in parole release. R.I.Gen.Laws 1956, § 13-8-14.1.

**2. Civil Rights ⚷13.4(5)**

Although new statute does create a cognizable liberty interest in parole, none of the due process violations which prisoner alleged occurred after effective date of that statute, and thus he could not maintain section 1983 action alleging various due process violations in Parole Board's consideration of his parole petitions. R.I. Gen.Laws 1956, § 13-8-14.1; 42 U.S.C.A. § 1983; U.S.C.A. Const.Amends. 5, 14.

---

William Petrarca, pro se.

George M. Cappello, R.I. Dept. of Corrections, Cranston, R.I., for defendants.

MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

This case presents the question of whether the Rhode Island parole statutes create a cognizable liberty interest in parole release.

The plaintiff is an inmate at the Adult Correctional Institutions in Cranston, Rhode Island. He is currently serving a twenty year sentence following a plea of guilty to second degree murder. The Rhode Island Parole Board (Board) has consistently denied him release on parole because of the heinous nature of the crime he committed. Alleging various due process violations in the Board's consideration of his parole petitions, Petrarca filed this suit under 42 U.S.C. § 1983 for declaratory and injunctive relief. The case is currently before this Court to review a magistrate's recommendation that the case be dismissed.

The magistrate's opinion appears to be based on two grounds. First, the magistrate stated that,

> [a] prisoner challenging either the decision of the parole board or the process by which that decision was made must show that the action of the board was so unlawful as to make his custody in violation of the laws of the United States. I find that the plaintiff has failed to meet the burden of such a showing in this matter.

Second, quoting the statement in *Johnson v. Wells,* 566 F.2d 1016, 1018 (5th Cir.1978), that the expectancy of release on parole in Texas is not a constitutionally protected liberty or property interest, the magistrate found "that this action is not based upon the violation of any federally protected right." The Court will address the liberty interest question first.

Exhibit (4)

The Rhode Island Supreme Court recognized that a prisoner is entitled to some due process protections in parole release hearings in *State v. Ouimette,* 117 R.I. 361, 367 A.2d 704 (1976). However, although that opinion relies heavily on federal cases interpreting federal law, it does not specify whether its conclusion is based on concepts of due process stemming from the United States Constitution, the Rhode Island Constitution, or both. Additionally, in the more recent case of *Lerner v. Gill,* 463 A.2d 1352 (R.I.1983), the Rhode Island Supreme Court analyzed the same statute it had in *Ouimette,*[1] but seemed less disposed to find that it created any due process rights:

In *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), the Supreme Court, in considering a Nebraska statute that was considerably more restrictive than § 13–8–14, rejected a prisoner's contention that the language of the statute created a "protectible expectation of parole," pointing out that the existence of a mere statutory expectation did not mandate repeated adversary hearings in order to continue a convict's confinement. *Id.* at 14, 99 S.Ct. at 2107, 60 L.Ed.2d at 679–80. Our statute creates no greater expectation of liberty than its Nebraska counterpart. Thus, we find that Lerner had no protectable entitlement to parole.

463 A.2d at 1365.

However, since the statute analyzed in these decisions is no longer in effect, *see* note 1 *supra,* and since there has been an addition to the parole release scheme, R.I. Gen.Laws § 13–8–14.1 (enacted 1982), this Court must undertake an independent analysis of whether the Rhode Island parole statutes created a liberty interest in parole at various times. *Cf. Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 12, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979) ("whether any other state statute [than Nebraska's] provides a protectible entitlement must be decided on a case-by-case basis.").

Although the Rhode Island Supreme Court correctly characterized *Greenholtz* as not recognizing a right to a formal parole hearing for every Nebraska inmate, the United States Supreme Court did find that the statute there created a liberty interest in parole release: "We can accept respondents' view that the expectancy of release provided in this statute is entitled to some measure of constitutional protection." 442 U.S. at 12, 99 S.Ct. at 2106. *See* Note, Violations of the Double Jeopardy Prohibition under the Federal Parole Release System, 63 B.U.L.Rev. 673, 705 (1983) (interpreting *Greenholtz*). Therefore this Court will compare the Rhode Island parole scheme at various times to the one in *Greenholtz* in which the United States Supreme Court found a constitutionally protected liberty interest.

The Nebraska statute stated:

Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, *it shall order his release unless* it is of the opinion that his release should be deferred because:

(a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

Neb.Rev.Stat. § 83–1, 114(1) (1976) (emphasis added).

In addition, the statute required the Nebraska parole board to take into account fifteen other factors. Fourteen of these were specific while one, "[a]ny other factor[ ] the board determines to be relevant," served as a catchall provision. Neb.Rev. Stat. § 83–1, 114(2) (1976).[2] The Court accepted the prisoners' view

that the structure of the provision together with the use of the word "shall" binds the Board of Parole to release an inmate unless any one of the four specifically designated reasons are found. In their view, the statute creates a presumption that parole release will be granted, and that this in turn creates a legitimate expectation of release absent the requisite finding that one of the justifications for deferral exists.

*Greenholtz, supra,* at 11–12, 99 S.Ct. at 2106 (Court describing prisoners' argument).

Before the enactment of R.I.G.L. § 13–8–14.1 in 1982, the criteria to determine whether a prisoner eligible for parole

1. In *Ouimette,* the Rhode Island Supreme Court analyzed R.I.Gen.Laws of 1956 (1969 Reenactment) § 13–8–14, which stated:

Disposition of prisoner to reform-Assurance of employment or support.—A permit shall not be issued to any prisoner under the authority of §§ 13–8–9 to 13–8–13, inclusive, unless it shall appear to the board:

a. That such prisoner is deserving of such permit by reason of his good conduct while imprisoned, and that such prisoner has shown a disposition to reform.

b. That such prisoner will be able to secure employment as soon as he is at liberty upon parole, or is otherwise provided for so that he will not become dependent upon public charity.

In *Lerner,* the Rhode Island Supreme Court apparently construed this same version of § 13–8–14 which it cited as "G.L.1956 (1969 Reenactment) § 13–8–14" and which it characterized as stating

that a prisoner would not be paroled unless it appeared to the board that (1) the prisoner was deserving of such parole because of his good conduct while in prison and that such prisoner had shown a disposition to reform and (2) the prisoner would be able to secure employment upon parole and thus not become a public charge.

463 A.2d at 1365.

The court in *Lerner,* unfortunately, stated that this version of § 13–8–14 was in effect in the spring of 1979, *see* 463 A.2d at 1365; however, it appears that the version in effect in the spring of 1979 was that one which had been enacted on June 2, 1976:

PAROLE RELEASE CRITERIA.—A permit shall not be issued to any prisoner under the authority of 13–8–9 to 13–8–13 inclusive unless it shall appear to the board:

(a) That the prisoner has substantially observed the rules of the institution in which confined;

(b) That release would not depreciate the seriousness of his offense or promote disrespect for law, and;

(c) That there is a reasonable probability that the prisoner, if released, would live and remain at liberty without violating the law....

1976 R.I.Pub.Laws ch. 223.

This section was subsequently amended to the current § 13–8–14 by 1980 R.I.Pub.Laws ch. 292.

2. The fifteen factors in the Nebraska statute were:

(a) The offender's personality, including his maturity, stability, sense of responsibility and any apparent development in his personality which may promote or hinder his conformity to law;
(b) The adequacy of the offender's parole plan;
(c) The offender's ability and readiness to assume obligations and undertake responsibilities;
(d) The offender's intelligence and training;
(e) The offender's family status and whether he has relatives who display an interest in him or whether he has other close and constructive associations in the community;
(f) The offender's employment history, his occupational skills, and the stability of his past employment;
(g) The type of residence, neighborhood or community in which the offender plans to live;
(h) The offender's past use of narcotics, or past habitual and excessive use of alcohol;
(i) The offender's mental or physical makeup, including any disability or handicap which may affect his conformity to law;
(j) The offender's prior criminal record, including the nature and circumstances, recency and frequency of previous offenses;
(k) The offender's attitude toward law and authority;
(*l*) The offender's conduct in the facility, including particularly whether he has taken advantage of the opportunities for self-improvement, whether he has been punished for misconduct within six months prior to his hearing or reconsideration for parole release, whether any reductions of term have been forfeited, and whether such reductions have been restored at the time of hearing or reconsideration;
(m) The offender's behavior and attitude during any previous experience of probation or parole and the recency of such experience; and
(n) Any other factors the board determines to be relevant.

Neb.Rev.Stat. § 83–1,114(2) (1976).

should be granted parole, were set forth exclusively in § 13–8–14. From June 2, 1976, to May 15, 1980, § 13–8–14 stated, in relevant part:

> PAROLE RELEASE CRITERIA.—A permit *shall not* be issued to any prisoner under the authority of 13–8–9 to 13–8–13 inclusive *unless* it shall appear to the board:
>
> (a) That the prisoner has substantially observed the rules of the institution in which confined;
>
> (b) That release would not depreciate the seriousness of his offense or promote disrespect for law, and;
>
> (c) That there is a reasonable probability that the prisoner, if released, would live and remain at liberty without violating the law.
>
> 1976 R.I.Pub.Laws ch. 223 (amended by 1980 R.I.Pub.Laws ch. 292) (emphasis added).

The 1980 amendment to the section changed it to its present form:

> A permit *shall not* be issued to any prisoner under the authority of §§ 13–8–9 to 13–8–13 inclusive *unless* it shall appear to the board:
>
> (a) That the prisoner has substantially observed the rules of the institution in which confined as evidenced by reports submitted to the parole board by the director of the department of corrections, or his designated representatives in a form to be prescribed by the director;
>
> (b) That release would not depreciate the seriousness of his offense or promote disrespect for law;
>
> (c) That there is a reasonable probability that the prisoner, if released, would live and remain at liberty without violating the law; and
>
> (d) That the prisoner can properly assume a role in the city or town in which he is to reside. In assessing his role in the community the board shall consider,
>
> (1) whether or not the prisoner has employment
>
> (2) the location of his residence and place of employment
>
> (3) the needs of the prisoner for special services, including but not limited to, specialized medical care and rehabilitative services....
>
> R.I.Gen.Laws § 13–8–14 (1981 Reenactment) (emphasis added).

Neither of these statutes contain the mandatory language or statutory structure which created an expectancy of release in *Greenholtz*. Sections 13–8–9 through 13–8–13, to which both of these versions of § 13–8–14 refer, merely establish minimum periods of time after which a prisoner "may" be considered for parole release. By its use of "shall not"/"unless" language in these versions of § 13–8–14, the legislature has modified only the Board's discretion to release a prisoner before these criteria are met—it has not modified the Board's discretion to keep a convict in prison for any amount of time, up to his maximum sentence, after he has met these criteria. He therefore has no meaningful expectation of parole release at any given time.

[1] However, the enactment of R.I.Gen. Laws § 13–8–14.1 did put a cognizable liberty interest in the Rhode Island scheme. Section 13–8–14.1 states:

> Parole standards.—At least once each calendar year commencing on January 1, 1983, the parole board *shall adopt* standards to be utilized by the said board in evaluating applications for parole of persons convicted of a criminal offense and sentenced to the adult correctional institutions. Said standards *shall establish*, with the range of parole eligibility set by statute, the portion of a sentence which *should* be served upon conviction for each category of criminal offense prior to parole, and *shall serve* as guidelines for the board in making individual parole determinations. The board *shall consider* the applicable standard prior to rendering a decision on a parole application, *and may make a determination at variance with that standard only upon a finding that such determination is warranted by individualized factors such as the character and criminal record of the applicant, the nature and circumstances of the offense or offenses for which the applicant was sentenced, the conduct of the applicant while incarcerated, and the criteria set forth in § 13–8–14.* In each case where the board grants an application prior to the time set by the applicable standard or denies an application on or after the time set by that standard, the board shall set forth in writing the rationale for its determination.
>
> *Id.* (inserted by 1982 R.I.Pub.Laws ch. 375 § 10) (emphasis added).

R.I.Gen.Laws § 13–8–14.1 limits the great discretion conferred on the Parole Board by the earlier statutes. Although the Board is able to set its own guidelines, it is also required to follow them. Although the "such as" language of the third sentence appears to allow the board to consider factors other than those specifically enumerated in either § 13–8–14.1 or § 13–8–14, this language vests the board with no more discretion, and probably less, to consider other criteria than that conferred on the Nebraska parole board by the "catch all" provision of the Nebraska statute. Moreover, the mandatory language of § 13–8–14.1 combined with the requirement of written guidelines (which was not present in the Nebraska scheme) make the present Rhode Island scheme resemble the federal one. *See* 18 U.S.C. § 4206. The Courts of Appeals for the Seventh and Eighth Circuits, the United States District Court for the District of Colorado, and one commentator have all found that the federal scheme created a liberty interest. *Solomon v. Elsea*, 676 F.2d 282, 285 (7th Cir. 1982); *Evans v. Dillahunty*, 662 F.2d 522, 526 (8th Cir.1981); *Castaldo v. United States Parole Commission*, 554 F.Supp. 985, 986 (D.Colo.1983); Note, Violations of the Double Jeopardy Prohibition under the Federal Parole Release System, 63 B.U.L. Rev. 673, 706–08 (1983). Therefore, the magistrate erred in concluding that parole did not give rise to a liberty interest without comparing the statutes in effect at different times to the statute in *Greenholtz*. Some parole statutes do create cognizable liberty interests in parole.

[2] The Court therefore turns to the magistrate's conclusion that the petitioner has not shown "that the action of the board was so unlawful as to make his custody in violation of the laws of the United States." None of the due process violations which the petitioner alleges occurred after January 1, 1983—the effective date of § 13–8–14.1. Since none of the statutes in effect before § 13–8–14.1 created a cognizable liberty interest under the federal Constitution,[3] the only question remaining is whether *Ouimette* has any remaining effect cognizable under the federal Constitution.

*Ouimette* may have been totally overruled sub silentio by *Lerner*. *See supra*. Nevertheless, *Lerner* explicitly found no liberty interest in the statute analyzed in *Ouimette*. Moreover, this Court has found that no Rhode Island parole statute at issue in this case existing before the enactment of § 13–8–14.1 created a cognizable liberty interest under the federal Constitution. Any right to specificity in the statement of reasons for denial of parole under the statutes existing before § 13–8–14.1 would have to be based in state law. Therefore, since any right under *Ouimette* in this case would only be based on state law, and since *Ouimette* may have been overruled sub silentio in *Lerner*, the magistrate was correct in concluding that Petrarca has not alleged a violation of the laws of the United States.[4] This conclusion on the basis of this complaint, however, should

3. By analyzing this case in terms of whatever parole provision was in effect at a certain time, the Court does not mean to imply that these laws may always be changed with retroactive effect. The Court recognizes that, in some instances, the retroactive application of parole laws might violate the ex post facto clause of the federal Constitution. *See* Note, Application of the Federal Parole Guidelines to Certain Prisoners: An Ex Post Facto Violation, 62 B.U.L.Rev. 515 (1982). This question, however, is not an issue in this case.

4. The Court notes that even if it had found that *Ouimette* provided a correct standard in this case, the reasons given the plaintiff may have been sufficient under *Ouimette*.

not be seen to derogate the fact that since § 13-8-14.1 now creates a cognizable liberty interest, the mandates of *Greenholtz* would now apply to parole in Rhode Island.

Therefore, the Court adopts the magistrate's recommendation, although not his reasoning, and hereby orders that the case be DISMISSED.

KEY NUMBER SYSTEM

**Richard G. VERRI, et al.**

**v.**

**STATE AUTOMOBILE MUTUAL INSURANCE CO.**

**Civ. A. No. 82-0813P.**

United States District Court, D. Rhode Island.

March 23, 1984.

Rhode Island residents who were occupants of vehicle involved in accident in New Hampshire brought action against vehicle's insurer, an Ohio corporation, based on insurer's alleged bad faith in settling and paying plaintiffs' claims. The District Court, Pettine, Senior District Judge, held that: (1) the district court had personal jurisdiction over defendant insurer; (2) rule providing that if service is not made within 120 days of filing complaint and plaintiff cannot show "good cause" for the delay, then the action shall be dismissed did not apply to complaint filed before the rule took effect, even though the rule took effect before service was made; and (3) district court did not have to decide whether plaintiffs' reason for seven-month delay in service of process by mail was consistent with "due diligence" where defendant had not alleged any prejudice caused by the delay.

Defendant's motion to dismiss denied.

**1. Federal Courts ⚷84**

District Court for the District of Rhode Island had personal jurisdiction over Ohio-based automobile insurer in action brought by Rhode Island residents for bad faith settlement of plaintiffs' claims arising out of accident in New Hampshire, where both locus of the accident and forum for the litigation were within geographic area in which insurer agreed to insure the automobile, policy contained arbitration clause allowing judgment to be entered on arbitration award in any court having jurisdiction of the award, arbitration did take place in Rhode Island and plaintiffs successfully petitioned Rhode Island court to confirm the award, and where all settlement activities in which bad faith was alleged had substantial connection with, Rhode Island. R.I. Gen.Laws § 9-5-33.

**2. Federal Civil Procedure ⚷1751**

Rule providing that, if service is not made within 120 days of filing of complaint and plaintiff cannot show "good cause" for the delay, then the action shall be dismissed, did not apply to complaint filed before the rule took effect, even though the rule took effect before service was made. Fed.Rules Civ.Proc.Rule 4(j), 28 U.S.C.A.

**3. Federal Civil Procedure ⚷417**

District court did not have to decide whether plaintiffs' reason for seven-month delay in service of process by mail was consistent with "due diligence" where defendant had not alleged any prejudice caused by the delay. Fed.Rules Civ.Proc. Rules 4, 41(b), 28 U.S.C.A.

---

Robert P. Verri, Providence, R.I., for plaintiffs.

Anthony G. Iannuccillo, Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This action is based on the defendant insurance company's alleged bad faith in settling and paying plaintiffs' claims. On December 29, 1979, the Rhode Island resident plaintiffs were traveling in an automobile insured under one of defendant's policies along Interstate 93 in Northfield, New Hampshire; at that time their auto was allegedly struck by a hit-and-run driver. The defendant, an Ohio corporation, employed a Rhode Island claims adjuster to evaluate the claim. This adjuster, acting as the agent for the Ohio company, later notified the plaintiffs that their claim had been denied. The plaintiffs continued to demand payment and finally, in keeping with the provisions of their insurance contract, submitted their claims to arbitration. As a result of the arbitration, which took place in Rhode Island, they were granted a damage award. After the defendant had not paid the arbitrator's award, the plaintiffs petitioned the Rhode Island Superior Court to confirm the same. The defendant's challenge to the award was unsuccessful both in the Superior Court and on appeal to the state Supreme Court. The plaintiffs then brought this action on December 28, 1982, filing a complaint. Service of process on defendant, however, was not accomplished until seven months later, on July 29, 1983.

Defendant has moved this Court to dismiss the complaint for lack of personal jurisdiction. It also contends the complaint should be dismissed pursuant to Fed.R.Civ.P. 41(b) because the complaint was not served within a reasonable amount of time.

[1] The issue of personal jurisdiction in this case is a difficult one. The defendant is an Ohio corporation with its principal place of business in Columbus, Ohio. The named insured in this contract is Samuel Wallack of Shaker Heights, Ohio. The insured automobile was registered in Ohio. The defendant is not registered or licensed to do business, has never written *new* insurance business,[1] neither owns, rents, nor possesses any property, maintains no office, neither files tax returns nor pays taxes, does not advertise, maintains no bank or brokerage accounts, has no statutory registered agent for service of process, maintains no directory listings, and has no employees in Rhode Island. Finally, the insurance claim arose from an accident in New Hampshire.

Despite the paucity of defendant's contacts with Rhode Island before this claim, this Court finds that it has personal jurisdiction over the defendant for the purposes of this action.

The applicable Rhode Island jurisdictional statute, R.I.G.L. § 9-5-33, goes to the federal constitutional limit in holding foreign corporations amenable to suit in Rhode Island. R.I.G.L. § 9-5-33. *See Roger Williams General Hospital v. Fall River Trust Co.*, 423 A.2d 1384 (R.I.1981). In a case involving Puerto Rico's similar jurisdictional statute, which has also been interpreted to go to the federal constitutional limit, the United States Court of Appeals for the First Circuit found that the federal District Court for the District of Puerto Rico had jurisdiction over two foreign insurance underwriters, neither of which claimed to transact business, sell insurance, or maintain an office in Puerto Rico. *Puerto Rico v. The SS Zoe Colocotroni*, 628 F.2d 652, 667-70 (1st Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981). The District Court's jurisdiction in *The SS Zoe Colocotroni* was based on the facts that the defendant English insurance companies

> plainly knew that vessels [they] insured would call on Puerto Rico from time to time, and [they] made no apparent effort to halt or limit this practice. In fact, by advertising the name of [their] local correspondent in San Juan, [they] affirmatively encouraged such commerce. This is not a case of a single isolated and unpreventable appearance of an insured vessel in Puerto Rican waters; the record shows that such appearances

1. Although the defendant alleges that it has never written *new* insurance in Rhode Island, it is silent as to whether it has renewed old contracts of insurance to cover automobiles or people who moved to Rhode Island.